## UNITED STATES DISTRICT COURT,
## DISTRICT OF NEBRASKA

ANDREW JOHANSSON,             )
HEATHER PORTER,               )
JON PEARCE,                   )     CLASS ACTION COMPLAINT
LINDA STANLEY, and           )
ANETRA FAISON, on behalf of themselves   )
and the Class Members described herein,    )     Demand for Trial by Jury
                                 )
        Plaintiffs,           )     Designation: Trial Location
                                 )
v.                              )
                                 )
NELNET, INC., a Nebraska Corporation,   )
NELNET DIVERSIFIED SOLUTIONS, LLC,
a Nebraska limited liability company, and
NELNET SERVICING LLC, a Nebraska
limited liability company.

         Defendants.

Plaintiffs allege:

## Overview

1.    Plaintiffs ANDREW JOHANSSON, HEATHER PORTER, JON PEARCE, ANETRA FAISON, and LINDA STANLEY sue Defendants, NELNET, INC., a Nebraska Corporation, NELNET DIVERSIFIED SOLUTIONS LLC, a Nebraska limited liability company, and NELNET SERVICING, LLC, a Nebraska limited liability company. They allege that Defendants 1) breached their Servicing Contract[1] with the federal government, of which Plaintiffs were intended third-party beneficiaries; 2) breached the Promissory Notes[2] that set forth the terms of Plaintiffs' federal student loans; and 3) violated state laws by making

---

[1] A prototype Servicing Contract appears at Attachment 1.
[2] A prototype Promissory Note appears at Attachment 2.

negligent representations to borrowers about their student loans, and engaging in other unfair, deceptive, and abusive practices as set forth below.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit is brought as a class action on behalf of proposed classes, each in excess of 100 members, the aggregate claims of the Class Members exceed $5 million exclusive of interest and costs, and one or more members of each Class is a citizen of a different state than one or more Defendants.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 139l(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## NATURE OF THE ACTION

4.      Since June 2009, Defendant Nelnet Inc., and its subsidiaries, Nelnet Servicing LLC and Nelnet Diversified Solutions, LLC, acting as agents on behalf of Nelnet Inc., (collectively, "Nelnet") have served as one of four primary student loan servicers of U.S. federal student loan debt. Loan servicers, who contract with the U.S. Department of Education ("DOE") perform services such as collecting payments, responding to borrower inquiries, processing applications loan deferment or forbearance, and administering federal student loan repayment programs.

5.      Nelnet continues to receive servicing fees for administering federal IDR plans.

6.      As federal loan servicers, Defendants are responsible for administering the various Income-Driven Repayment Plans ("IDR plans") offered by the federal government. IDR plans allow federal loan borrowers to make affordable monthly payments based on their gross income and family size. Borrowers who enroll in IDR plans become eligible for loan forgiveness after making a certain number of qualifying payments under the plan. For instance, under the "Income-

Based Repayment Plan," the borrower's monthly payments are capped at fifteen percent of discretionary income, and the remaining debt is discharged after twenty-five years of qualifying payments.

7.     Nelnet improperly canceled or failed to renew Plaintiffs' IDR plans, and improperly delayed the process whereby borrowers enroll in and renew such plans. These actions caused Plaintiffs and many other borrowers to incur thousands of dollars in improper fees and charges and thwarted their progress toward loan forgiveness.

8.     Nelnet  also improperly placed the loans of countless borrowers into hardship forbearance during the IDR recertification process, causing unpaid accrued interest to be "capitalized," or added to the borrower's principal loan balance.

9.     These practices caused Plaintiffs and similarly situated borrowers to suffer financial damages.  Plaintiffs and Class Members lost out on qualifying loan payments toward forgiveness, were overcharged, and were deprived of benefits of federal laws intended to protect them from burdensome debt.

10.     These practices are believed to be systemic, affecting all Class Members. Discovery is required to ascertain the means, methods, and scope of harm caused by Defendants.

11.     Defendant's actions are typical of widespread misconduct by federal loan servicers.[3] Between March 1 and August 31, 2016, a frequent complaint to the Consumer Financial Protection Bureau (CFPB) against Defendants involved irregularities relating to enrollment in, and renewal of, IDR plans.[4]

---

[3] *See* Annual Report of the CFPB Student Loan Ombudsman, October 2016, available at https://www.consumerfinance.gov/data-research/research-reports/2016-annual-report-cfpb-student-loan-ombudsman/ (last visited May 8, 2018).
[4] *Id.*

12.     Nelnet received six hundred and twenty-nine CFPB complaints from federal student loan borrowers between September 1, 2016 and August 31, 2017. Seventy-nine percent of these complaints involved difficulties borrowers encountered in dealing with their lender or servicer.[5] Plaintiffs are student loan borrowers and are among the persons victimized by Defendants.

## BACKGROUND ON INCOME-DRIVEN REPAYMENT PLANS

13.     Federal student loans are loans that are either owned or insured by the federal government pursuant to the Higher Education Act.  Repayment options to fit a borrower's short-term and long-term needs are provided.

14.     The "Standard Repayment Plan" for federal student loans is the  payment plan used by default if no other payment plan is chosen.  Under the Standard Repayment Plan, monthly payments are set to repay the borrower's balance within 10-30 years. Many borrowers who cannot afford payments under the Standard Repayment Plan enroll in one or over time more than one of the IDR plans with  lower monthly payments.  For instance, under the "Income Based Repayment" plan, the borrower's monthly payments are capped at fifteen percent of discretionary income, and the remaining debt is discharged after twenty-five years of qualifying payments. Under some IDR plans, monthly payments can be as low as $00.00 per month.

15.     When borrowers enroll in an IDR plan, the plan is effective for a one-year period.[6] In order to renew the plan for each subsequent year, borrowers must annually recertify their income level and family size by submitting an IDR renewal application, along with proof of income, to their loan servicer.[7]

---

[5] *Id.*
[6] *See, e.g.*, 34 C.F.R. § 685.209 (a)(5).
[7] *Id.*

16.     Several months prior to the expiration of an IDR plan, the loan servicer must send the borrower a written notice of the "annual deadline" by which the borrower must recertify the plan to continue with income-based payments under the plan.[8] This notice must include the consequences of failing to recertify the plan by the annual deadline. *See id.* Among these consequences are an increase in monthly payments from an affordable amount, based on the borrower's income, to the amount required under the Standard Repayment Plan, which is often several times higher.[9] In addition, any accrued interest is "capitalized" when the borrower does not timely renew the plan.[10] "Capitalization" refers to the addition of accrued interest to the principal loan balance, which can significantly increase the amount owed on the loan.

17.     Federal law provides certain protections for borrowers enrolled in IDR plans who timely renew their IDR plans. For instance, when a loan servicer receives a borrower's IDR renewal application and proof of income before the annual renewal deadline, the loan servicer is prohibited from cancelling the IDR plan while the request is being processed. Rather, the servicer "must maintain the borrower's current scheduled monthly payment amount" until the IDR renewal application is fully processed.[11] If the loan servicer timely receives the borrower's IDR renewal application and proof of income, the income-driven payments are to continue until the application has been fully processed, regardless of how long it takes the loan servicer to complete that process.

18.     Loan servicers must "promptly" process all IDR renewal applications.[12] Thus, the loan servicer has an *affirmative duty* to efficiently process the borrower's recertification materials to ensure smooth re-enrollment from one year to the next.

---

[8] *See* 34 C.F.R. § 685.209 (a)(5)(iii).
[9] *See* 34 C.F.R. § 685.209 (a)(5)(iii)(B).
[10] *Id.*
[11] *See* 34 C.F.R. § 685.209 (a)(5)(viii)(A)
[12] *Id.*

19.     If a borrower submits an IDR renewal application and proof of income, but the loan servicer determines that additional paperwork is needed to process the borrower's request, the loan servicer must place the borrower's account on an administrative forbearance.[13] Under this provision, a borrower is entitled to a 60-day forbearance, *with no resulting capitalization of interest*, if the purpose of the forbearance is to allow the loan holder to collect and process documentation supporting the borrower's request for any changes to the repayment plan.

20.     Separate from administrative forbearances, borrowers may request a hardship forbearance if the borrower is unable to make payments "due to illness or other acceptable reasons."[14] Hardship forbearances, however, are not authorized as a means to provide loan servicers with additional time to process IDR applications.

21.     Hardship forbearances    are far costlier to the borrower than administrative forbearances  because, with a hardship forbearance, any unpaid interest that accrues during the forbearance gets "capitalized," or added to the borrower's loan balance.

## PLAINTIFFS

### ANDREW JOHANSSON

22.      At all times relevant hereto, Andrew Johansson was a resident of Chicago, Illinois. He received various federal loans under the Federal Direct Loan Program to help pay the costs of his education. These loans are serviced by Nelnet. Pursuant to Johansson's promissory note with the federal government, they must be serviced in accord with federal law and applicable state law.

23.     In 2017, Johansson was enrolled in the IBR plan and making monthly payments in the amount of $142.66. In September of 2017, prior to the annual recertification deadline, he mailed  to NelNet his application to recertify the plan, accompanied by tax records documenting

---

[13] This action is required by 34 C.F.R. §685.205(b)(9).
[14]   34 C.F.R § 685.205(a).

his gross income. Johansson did all that was required of him to continue the IBR plan. However, in November of 2017, he received  from NelNet a bill for a payment of $1,173.60 pursuant to the Standard Repayment Plan.

24.    Nelnet failed to properly process Johansson's IDR renewal application in accordance with federal law. As a proximate result, Mr. Johansson's IBR plan was canceled.

25.    When Johansson learned that Nelnet did not process his recertification materials, he re-submitted them electronically using Nelnet's online portal. He did so on November 22, 2017. Nelnet eventually approved his second submission, but the plan was not renewed until January of 2018. Johansson did all that was required and did so on a timely basis.

26.     Johansson could not afford payments of $1,173.60. He was directed by Nelnet to place his loans into hardship forbearance while his IBR recertification materials were processed even though hardship forbearance is not authorized for this purpose. Despite so instructing him, Nelnet did not perform as promised when Johansson's forbearance election was made.

27.    Rather than placing Johansson's loans into hardship forbearance only until his IDR renewal application was processed, Nelnet applied a hardship forbearance to his account for fourteen months – from October of 2017 until December of 2018. During this time, and interest accrued and was capitalized. This increased the balance on Johansson's student debt rather than decreasing it. It put him farther in debt rather than progressing him toward freedom from student debt.

28.    While this unauthorized capitalization of interest was occurring, Mr. Johansson contacted Nelnet on multiple occasions and demanded that the forbearance be canceled and that he be billed according to his approved IBR plan. Nelnet took no action to discontinue the forbearance and resume his IDR plan. Instead, it caused interest to continue to capitalize. Now

that's action was required to stop the capitalization, reinstituted the IDR plan, and effectuate Mr. Johansson's rights as a borrower.

29.    As a proximate result of the hardship forbearance, Johansson incurred an interest capitalization of $26,194.27 in January of 2018.

**HEATHER PORTER**

30.    Heather Porter was a citizen of Missouri at all times relevant. In 2013 she consolidated her various federal student loans into a single Federal Direct Consolidation Loan. This loan is serviced by Nelnet. Pursuant her promissory note with the federal government, it must be serviced in accordance with federal law and applicable state law.

31.    Throughout 2018, Porter was enrolled in an IDR plan and made income-driven payments. On December 10, 2018, she received an email stating that her plan would expire unless renewed by the deadline of January 29, 2019. The email advised that she would be billed in the amount of $1,174.47 under the Standard Repayment Plan if she did not timely renew the plan.

32.    On December 14, 2018, Porter electronically submitted to Nelnet her IDR renewal application and proof of income as required. On the same date, Nelnet sent Porter confirmation stating that her IDR application had been received and would be reviewed shortly. Porter did all that was required and did so on a timely basis.

33.    On January 9, 2019, Nelnet advised Porter in writing, "This is your final reminder to recertify your income-driven repayment plan. If you do not recertify by submitting an application, income documentation, and family size by 01/29/2019, your regular monthly payment amount on your income-driven repayment plan will change to $1,174.47." This message contradicted Nelnet's message from December 14, 2018, acknowledging receipt of her IDR renewal application. Because of the conflicting statements, Porter faxed a copy of her previously

submitted and received  IDR renewal application with an updated proof of income. She sent these materials to nail net on  January 10, 2019.

34.     On March 21, 2019, Nelnet sent Porter a demand that owed a payment of $1,174.47 required to be paid by the following day. Porter then learned that, despite her timely submissions of two IDR renewal applications with proof of income, Nelnet canceled her IDR plan without authorization or justification to do so. As a proximate result, Porter began to incur costly capitalization of interest that increase the principal balance of her student debt and increased her interest costs. Now Mentz unauthorized actions put Porter  farther in debt rather than progressing her toward freedom from student debt.

35.     On April 1, 2019, Porter emailed to Nelnet the paystubs   previously faxed on January 10, 2019. She she could not afford payments of $1,174.47.  Nelnet directed her to enroll in a hardship forbearance while her income documentation was being processed, even though hardship forbearances are not permitted for such purposes under federal law. The forbearance lasted for several months, resulting in an additional, and unauthorized interest capitalization, resulting in additional interest expense and increased debt.

**JON PEARCE**

36.     At all times relevant hereto, Jon Pearce was a resident of Texas. He received various federal loans under the Federal Direct Loan Program to help pay costs of his education. These loans are serviced by Defendants. Pursuant to his promissory note with the federal government, they must be serviced in accordance with federal law and applicable state law.

37.     In or around late 2016, Pearce attempted to enroll in an IDR plan. On November 3, 2016, Pearce electronically submitted an IDR application with proof of income to Nelnet using a self-certified letter documenting his income. He included this letter pursuant to instructions on the

9

renewal application which stated, "If documentation [of your income] is not available or you want to explain your income, attach a signed statement explaining each source of income and giving the name and the address of each source of income." Pearce modeled his self-certified letter after a template provided  by Nelnet.

38.    In December of 2016, Nelnet denied Pearce's IDR application because his signed statement documenting his income did not specify that the income listed was his "gross" income. However, on the renewal application, where the instructions state, "This is how you document your income," there is no instruction requiring that the borrower use the word "gross" when providing a self-certified letter documenting their income. The instructions merely require "a signed statement explaining each source of income and giving the name and the address of each source of income."

39.    Over the next two months, Pearce continued diligent attempts to enroll in an IDR plan by submitting additional IDR applications and proof of income to Nelnet. However, on multiple occasions, he received  email from Nelnet stating that his application could not be processed because "more information" was needed, even though each submission complied with the instructions on the IDR application and each was complete. At no time did Nell net specify what "more information" it sought.  Pearce submitted eight  IDR applications in November and December of 2016,, each of which was sufficiently complete to a been acted upon, and each of which was not acted upon on a timely basis by Nelnet. Nelnet because the delays in  Pearce's enrollment process; Pearce did not. He did all that was required and did so on a timely basis. Pearce was eventually enrolled in an IDR plan with monthly payments in the amount of $98.50.

40.    In October of 2018, Pearce experienced difficulties recertifying his IDR plan. At or around that time, he received detailed instructions from Nelnet stating how his income

documentation should be provided to renew his IDR plan. Pearce then timely submitted an IDR renewal application to Nelnet. The IDR renewal conformed to the instructions Nelnet provided. He used appropriate income tax forms to document his income. Nonetheless, Nelnet informed him several weeks later that "more information was needed" to renew the plan. It did not specify what was needed.

41.    Pearce again re-submitted documents and tax forms to Nelnet via www.studentloans.gov, DOE's online portal. Nonetheless, on December 3, 2018, Pearce received another email from Nelnet stating that "more information was needed" to recertify his IDR plan. The same day, Pearce also received instructions from Nelnet detailing how his proof of income must be documented. No explanation was provided about deficiencies in prior submissions. Pearce followed these new instructions, submitted more documentation of his income, and again fully performed all that was required of him. Nonetheless, Nelnet again informed Pearce that his income documentation was insufficient, and that he would be required to start the process from the beginning using a self-certified letter verifying his income. Nelnet did not tell Pearce what was deficient about his prior submissions.

42.    Throughout December 2018, Pearce continued to receive inconsistent instructions from Nelnet regarding the manner of income documentation required to renew his IDR plan. He made more submissions of income documentation using documents that complied with Nelnet's stated requirements. Repeatedly, his submissions were declared "not sufficient" though no insufficiencies were identified. Pearce made at least five distinct IDR renewal application with Nelnet, but Nelnet refused to process these materials on each such occasion.

43.     As a proximate result of the actions by Nelnet, Pearce incurred multiple interest capitalizations, significantly increasing his loan balance, driving up interest cost, and forcing Pearce into greater debt.

44.     At the time of these events,  Pearce was employed by a government agency, and he continues to be so employed. Accordingly, Pearce was qualified for and intended to obtain an eventual full discharge of his loans under the Public Service Loan Forgiveness (PSLF) program. Under this program, Direct Loan borrowers who make 120 qualifying monthly payments under an IDR plan while working full-time for a governmental agency or non-profit organization can  have the remainder of their balance forgiven.

45.      Nelnet prevented Pearce from making qualifying IDR payments during his period of employment as a public service employer. This means Pearce must make more payments before he can qualify for balance forgiveness, and he has no career options but to remain in government employment for a longer period than otherwise would have been required to receive a discharge of his loans.  Nelnet's misconduct or malfeasance proximately caused Pearce to suffer capitalized interest, increased debt and debt service costs, delayed qualification for income forgiveness, truncated career choices, loss of time in his life to build a career he could have chosen had he been free to leave government employment when loan forgiveness occurred, and both general and special damages.

## LINDA STANLEY

46.     At all times relevant, Linda Stanley was a resident of Colorado. She received various federal student loans to help pay  costs of her education pursuant to the Federal Direct Loan Program. These loans are serviced by Defendants. Pursuant to her promissory note with the federal government,  they must be serviced in accordance with federal and applicable state law.

47.     Stanley enrolled in the IBR plan and was making income-driven payments of less than $100 per month. She intended to, and did all things necessary to, maintain and renew her IDR plan. Stanley's student debt is serviced by Nelnet.

48.     In or around January of 2018, as Stanley prepared to renew her IBR plan, she did not yet have completed tax returns, which she had used to document her income. She contacted Nelnet for directions Nelnet told Stanley to place her hardship loans in temporary forbearance until her tax returns were available and that there would be no adverse consequence from doing so. Stanley relied upon the affirmative representation of Nelnet that there would be no adverse consequence of placing her loans into a hardship forbearance until her 2017 tax returns were completed. He placed the loans in forbearance. Later, Nelnet imposed penalties for her doing so.

49.     Nelnet's representation to Stanley that she should place her loans into hardship forbearance until her taxes were completed was deceptive because it failed to inform Stanley that she could use a recent paystub to document her income and her tax returns were not required, and because hardship forbearances are not authorized for this purpose under federal law. Pursuant to 34 C.F.R § 685.205(a), such forbearances are only permitted when, "due to poor health or other acceptable reasons, the borrower…is currently unable to make scheduled payments."

50.     In or around February of 2018, Stanley submitted her recently completed tax returns to Nelnet to recertify her IDR plan. Nelnet did not accept Stanley's submissions on the basis that the "adjusted income" line of her tax return was "not legible" and therefore could not be processed. Stanley was then directed to complete a "self-certification letter" documenting her "gross income."

51.     Stanley drafted a type-written self-certification letter modeled after an example of a self-certification letter that Nelnet provided. Stanley submitted the letter in May of 2018.

13

52.     Nelnet failed to process Stanley's May 2018 letter on the basis that certain portions of the letter needed to be written out "by hand." In fact, this requirement has no basis in applicable federal law. Nelnet continued to refuse to process Stanley's renewal through July 2018. Stanley, however, complied with all requirements for IDR renewal.

53.     On July 5, 2018, Stanley submitted another self-certification letter to Nelnet . While these documents were being processed, Nelnet moved Stanley's loans into a hardship forbearance to "keep her account current."  However, this was an unauthorized and unlawful action as hardship forbearances are only permitted when, "due to poor health or other acceptable reasons, the borrower…is currently unable to make scheduled payments."[15]

54.     As a proximate result of the unauthorized hardship forbearance, approximately $7,000 of accrued interest was capitalized on Stanley's loans.

55.     In July of 2018, Nelnet erroneously calculated Stanley's repayment amount to be approximately $450, despite the fact that her income had not substantially increased since her prior pay period, when her payments were less than $100 per month.

56.     On July 27, 2018, Stanley notified Nelnet that the payment amount she was given was erroneous, but Nelnet took no action to correct the miscalculation. Stanley sent Nelnet additional IDR applications with copies of tax records to correct Nelnet's miscalculation, but Nelnet did not use these materials to enroll her in an IDR plan with the correct repayment amount. As a proximate result, Stanley was forced to place her loans into a costly hardship forbearance, triggering an additional interest capitalization.

57.     At the time of the aforesaid incidents, Stanley was employed by a government agency. She planned to  remain in government employment and  earned the right to eventual

---

[15] 34 C.F.R § 685.205(a).

14

discharge of her loans under the Public Service Loan Forgiveness (PSLF) program. The PSLF program allows Direct Loan borrowers who make 120 qualifying monthly payments under an IDR plan while working full-time for a governmental agency or non-profit organization to have the remainder of their balance forgiven.

58.     Nelnet prevented Pearce from making qualifying IDR payments during his period of employment as a public service employer. This means Pearce must make more payments before he can qualify for balance forgiveness, and he has no career options but to remain in government employment for a longer period than otherwise would have been required to receive a discharge of his loans.  Nelnet's misconduct or malfeasance proximately caused Pearce to suffer capitalized interest, increased debt and debt service costs, delayed qualification for income forgiveness, truncated career choices, loss of time in his life to build a career he could have chosen had he been free to leave government employment when loan forgiveness occurred, and both general and special damages.

59.      Stanley also incurred adverse credit reporting because of Nelnet's actions as set forth above.

**A<small>NETRA</small> F<small>AISON</small>**

60.     At all times relevant hereto, Anetra Faison was a resident of Michigan. She received various federal student loans to help pay costs of her education pursuant to the Federal Family Education Loan Program (FFELP). These loans are serviced by Defendants. Pursuant to her promissory note, they must be serviced in accordance with federal and applicable state law.

61.     Prior to 2018, Faison enrolled in the IBR plan and was making $00.00 monthly payments based on her  income at the time.

62.     In or around September of 2018, Faison received from Defendants a notice to renew her IBR plan by a specified renewal deadline. Before this deadline, Faison submitted an IDR renewal application and proof of income to Nelnet. Faison submitted these materials electronically and by first class mail. Her submission was complete and the she did all things required of her to qualify for renewal.

63.     For several months and on several occasions after receiving Faison's IBR renewal application and proof of income, Nelnet directed her to provide additional income documentation, even though she had already provided income documentation that satisfied DOE's requirements. Faison's renewal application was delayed. This caused deprivation of the opportunity to make IBR payments for several months in 2019. This significantly delayed progress toward loan forgiveness.

64.     Nelnet's failure to process and renew Faison's IBR plan prior to its expiration in 2018, resulted in her IBR plan being cancelled. This proximately caused Faison to incur a capitalization of accrued interest, increased the principal balance of her death and her interest costs, and drove her farther into debt rather than moving her closer to freedom from student debt.

65.     Faison was unable to afford her monthly payments after Nelnet cancelled her IBR plan. This caused Faison's loans to be declared delinquent for several months, caused her to incur adverse credit reporting.

## DEFENDANTS

66.     Defendant Nelnet Inc. was founded as the UNIPAC Loan Service Corporation in 1978 and renamed Nelnet in 1996.  It became a publicly traded company in 2003. Nelnet Inc. owns over 50 subsidiaries that administer and collect student loans throughout the United States and Canada, including Nelnet Servicing LLC and Nelnet Diversified Solutions LLC.

67.     Nelnet Servicing LLC is a wholly-owned subsidiary of Nelnet Diversified Solutions LLC, which is itself a wholly-owned subsidiary of Nelnet Inc.

68.     All Defendants are entities organized under state law and have their principal places of business at 121 S. 13th Street, Suite 201, Lincoln, Nebraska 68508.  Defendants are, at times, referred to collectively as "Nelnet."

69.     In 2009, a Servicing Contract (**Attachment A** attached) was executed between the United States Department of Education and Nelnet.  The contract was extended and modified in 2014 and remains in effect.

70.     Attached as **Attachment B** is a prototype Direct Consolidation Loan Application and Promissory Note / William D. Ford Federal Direct Loan Program. This  17-page prototype contains Loan Consolidation Information, Repayment Plan Selection Information, Terms, Understandings, Certifications, Authorizations, Promises to Pay, Note Terms and Conditions, and Notices, Mandatory Information to Be Reported Provisions, Interest Rate and Payment of Interest provisions, and provisions governing Repaying the Loan including descriptions of the Standard Repayment Plan, Graduated Repayment Plan, Extended Repayment Plan, REPAYE Plan, Pay As You Earn Plan, Income-Based Repayment Plan (IBR Plan), Additional Repayment Information, a section describing Defaulting, and provisions concerning late charges and collection costs, demands for immediate payment, Defaulting, Consumer Reporting Agency Notification, Deferment and Forbearance, Discharge or Loan Forgiveness, other forms of Loan Forgiveness, which are  Representative of the Promissory Notes of the Plaintiffs and Class Members and in the sections relevant to this case, common to the Plaintiffs and Class Members.

71.     Nelnet Inc. holds itself out as a major servicer of federal student loans owned by the DOE.[16] Nelnet publicly declared that it was awarded a student loan servicing contract by the Department of Education in June 2009 to provide additional servicing capacity for loans owned by the Department of Education, and that those loans include Federal Direct Loan Program loans originated directly by the Department and FFEL Program loans purchased by the Department."[17] Nelnet Inc. admits that, "as a student loan servicer for the federal government and for financial institutions, including the Company's FFELP student loan portfolio, the Company is subject to the Higher Education Act and related laws, rules, regulations, and policies."[18]

72.     Nelnet serviced at least $162.5 billion for six million student loan borrowers in 2016, including the loans of Plaintiffs. Twenty percent of Nelnet's revenue was attributed to the servicing of loans held by DOE.[19]

73.     Nelnet Inc. holds itself out as a party to DOE's Servicing Contract. Nelnet and its subsidiaries disregarded entity separateness and operated as a single unity. The separateness of Defendants is a disregarded fiction. Nelnet representations that it is a party to DOE Servings and Contract estops it to deny status.

74.     Nelnet Inc., Nelnet Diversified Solutions LLC, and Nelnet Servicing LLC, are all directly liable to Plaintiffs and members of the Classes under the Servicing Contract, the borrowers' Promissory Notes, and applicable state law. All three companies have acted in concert, with shared control of activities of their enterprise, for a common purpose, and to create a common

---

[16] 10-K filings with Securities and Exchange Commission for 2016, available at
https://s21.q4cdn.com/368920761/files/doc_financials/annual/2016/2016_Annual_Report.pdf (last visited May 7, 2018),
[17] *Id.*
[18] *Id.*
[19] *Id.*

fund of money. All three are joint venturers, and each is liable for the action or actions of the other in furtherance of the joint venture.

## CLASS ACTION ALLEGATIONS

75.    Nelnet's servicing of Plaintiffs' loans violated various federal regulations, including 34 C.F.R. §685.221(e)(8)(ii), which states that a loan servicer "must maintain the borrower's current scheduled monthly payment amount" until the request has been fully processed if the borrower's recertification materials were received prior to the renewal deadline.

76.    Nelnet's servicing of Plaintiffs' loans also violated 34 C.F.R. § 685.205(b)(9), which prohibits the capitalization of interest that accrues during forbearances that are applied in order to allow for additional processing time to review IDR plan renewal applications and supporting documentation. Rather than placing Plaintiffs' loans under administrative forbearances pursuant to 34 C.F.R. § 685.205(b)(9), Nelnet improperly and unlawfully used hardship forbearances pursuant to 34 C.F.R § 685.205(a) for this purpose, which resulted in the improper capitalization of interest.

77.    Defendants also violated 34 C.F.R. §685.221(e)(8)(i), which requires that IDR applications be processed "promptly."

78.    Nelnet's Servicing Contract with DOE requires compliance with all applicable federal regulations. The violations Nelnet committed breached the Servicing Contract, of which Plaintiffs were intended third-party beneficiaries.

79.    Plaintiffs' Promissory Notes require Nelnet to comply with the Higher Education Act and applicable federal law.  Nelnet's conduct constitutes a breach of the Promissory Note.

80.    As a direct and proximate result of Defendants' abusive practices, thousands of dollars were unlawfully added to Plaintiffs' principal loan balances, and they missed out on months

of qualifying payments toward loan forgiveness. The total amount of Plaintiffs' damages must be discovered through Nelnet's records.

81.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following proposed Classes:

## Breach of Contract Class

> All individuals with federal student loans serviced by Nelnet who, at any time on or after a date five years prior to the filing of this action: i) were enrolled in an IDR plan; ii) timely submitted an application to renew the plan; iii) the application was eventually approved; iv) but the IDR plan was temporarily discontinued by Nelnet while the application was being processed.

## Negligent Misrepresentation Class

> All individuals with federal student loans serviced by Nelnet who, at any time on or after a date four years prior to the filing of this action: i) were enrolled in an IDR plan; ii) timely submitted an application to renew the plan; iii) the application was eventually approved; iv) but the IDR plan was temporarily discontinued by Nelnet while the application was being processed.

## Illinois Class

> All individuals who 1) obtained their federal student loans while living in Illinois and experienced the following on or after a date three years prior to the filing of this action; or 2) were living in Illinois when they experienced the following, which occurred on or after a date three years prior to the filing of this action: i) The individual was enrolled in an IDR plan; ii) the individual timely submitted an application to renew the plan; iii) the application was eventually approved; iv) but the IDR plan was temporarily discontinued by Nelnet while the application was being processed.

## Colorado Class

> All individuals who 1) obtained their federal student loans while living in Colorado and experienced the following on or after a date three years prior to the filing of this action; or 2) were living in Colorado when they experienced the following, which occurred on or after a date three years prior to the filing of this action: i) The individual was enrolled in an IDR plan; ii) the individual timely

20

submitted an application to renew the plan; iii) the application was eventually approved; iv) but the IDR plan was temporarily discontinued by Nelnet while the application was being processed.

82.  The Classes exclude Defendants, their employees, any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns. Also excluded are the personnel and Judges of this Court.

83.  The Classes are composed of tens to hundreds of thousands of individuals and thus are so numerous that joinder of all members is impracticable. The Classes can be readily ascertained through the records maintained by Defendants.

84.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

85.  Plaintiffs' claims are typical of the claims of members of the Classes.

86.  As alleged herein, Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of unlawful conduct.  The injuries and damages of each member of the Classes were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein, and occurred in, and were directed from, this District.

87.  There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all Class Members.

88.  These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Class Members:

      a.    Do Defendants have a practice of misprocessing and delaying applications to renew IDR plans?

      b.    Did the misconduct of Defendants cause injuries to Plaintiffs and the Class Members by requiring them to pay avoidable interest, fees, and other sums?

21

    c.      Did the conduct of Defendants violate state or federal law, and are those violations directly actionable?

    d.      Did the conduct of Defendants constitute breach of the Servicing Contract?

    e.      Did the conduct of Defendants constitute a breach of the Promissory Notes of Plaintiffs?

    f.      Did the conduct of Defendants constitute negligent representation under the laws of Nebraska?

    g.       Did the conduct of Defendants violate Illinois law?

    h.      Did the conduct of Defendants violate Colorado law?

    i.      Did the conduct of Defendants violate North Carolina law?

89.    Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes. Plaintiffs have no claims antagonistic to those of members of the Classes. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of members of the Classes.

90.    Class action status is also warranted under Rule 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class Members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. Separate actions by individual members of

22

the Classes would create risks of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

91.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FIRST CLAIM
### Breach of the Servicing Contract

92.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

93.    This claim is brought on behalf of the Breach Class.

94.    On June 17, 2009, Nelnet Servicing LLC entered into a Servicing Contract with the Department of Education.  Nelnet Servicing LLC was a known agent of Nelnet Diversified Solutions LLC, and Nelnet Inc. – its disclosed principals – and was acting as their agent when it entered into the Servicing Contract.  Nelnet Inc. and Nelnet Diversified Solutions LLC are liable under the Servicing Contract.  Nelnet Servicing LLC executed the contract in its own name, thereby binding itself and its disclosed principal, Nelnet Inc., under the Servicing Contract.

95.    At all relevant times, Plaintiff and members of the Breach Classes were intended third-party beneficiaries of the Servicing Contract.

96.    Pursuant to the terms of the Servicing Contract, Defendants agreed to comply with all applicable federal statutes and regulations in its dealings with each plaintiff and each member of the classes.

97.    Defendants materially breached the Servicing Contract by failing to administer each Plaintiffs' loans and the loans of each member of Breach Class in accord  with federal law.

98.    As a direct and proximate result of Defendants' breach of the Servicing Contract, Plaintiffs and members of the Classes have suffered the same types damages,

including, but not limited to (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a Standard Repayment Plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with lost progress towards certain loan forgiveness.

<u>**SECOND CLAIM**</u>
**For Breach of the Promissory Note**

99.     Plaintiffs renew all allegations   above as if fully set forth here .

100.     This claim is brought on behalf of the Breach Class.

101.     By entering into the Servicing Contract with the Department of Education, Defendants accepted a delegation of the loan servicing obligations set forth in Plaintiffs' Promissory Notes and became assignees thereof.   Thus, at all relevant times, Plaintiffs and members of the Classes were in a contractual relationship with Defendants.

102.     The Promissory Note required Defendants to service the loans of Plaintiffs in accordance with federal law.

103.     As set forth above, Defendants materially breached the Promissory Note by failing to administer Plaintiffs' loans in accordance with federal law.

104.     As a direct and proximate result of Defendants' material breach of the Promissory Note, Plaintiffs and members of the Classes have suffered the same types of damages, including, but not limited to (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a Standard Repayment Plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with lost progress towards certain loan forgiveness.

## THIRD CLAIM
### Negligent Representation

105.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

106.    This claim is brought on behalf of the Negligent Misrepresentation Class.

107.    Defendants had a pecuniary interest in their transactions with Plaintiffs and the Class Members because the servicing fees that Defendants receive under the Servicing Contract are a direct function of the borrowers' performance under the loans.

108.    In the course of their business dealings with Plaintiffs and Class Members, Defendants wrongly supplied Plaintiffs and Class Members with false information regarding the terms of their loans.  The incorrect information amounted to misrepresentations intended to be relied upon, and actually relied upon, by Plaintiffs and Class Members.

109.    Plaintiffs relied on the false and negligent representations of Nelnet by making increased payments and/or enrolling in costly hardship forbearances that were not necessary.

110.    Defendants failed to exercise reasonable care or competence in communicating critical information to Plaintiffs and the Class Members regarding the repayment terms of their loans.

111.    Defendants are subject to liability for the pecuniary losses proximately caused to Plaintiffs and Class Members as a result of their justifiable reliance on the incorrect information provided by Defendants.

## FOURTH CLAIM
### Accounting at Law

112.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

113.    This claim is brought on behalf of the Breach Class.

114.    The Claims of Plaintiffs are based upon a contract.

115.    The improper fees and charges incurred by Plaintiffs and the Class Members do not arise out of a fiduciary or trust relationship, nor do they arise out of a complicated series of accounts.

116.    The transactional history of each individual class member's account is readily determinable, as are the dates and events relevant to a determination of liability for each individual class member. Accordingly, an accounting at law is an adequate remedy.

117.    The books and records required to make the accounting and determine the amounts due are in the possession and control of Nelnet.  A legal accounting is necessary because Nelnet received the funds of the Plaintiffs and Class members.

118.    Nelnet is not the owner of the funds it received from Plaintiffs the Class Members and is therefore bound to account to Plaintiffs and the Class Members for it.[20]

119.    An accounting at law may be performed with the electronic records of Defendants. Plaintiffs believe this may be done by identifying individual student loan borrowers who, like Plaintiffs, submitted applications to renew their IDR plans, and determining the dates when their documents were submitted; the dates when action on those documents was taken by Defendants; the nature of the action taken; and the financial consequences of those actions for each individual class member. In this manner, Plaintiffs believe that the proof of individual damages will bear a substantial similarity to class action cases in which it is determined that refunds must be paid for overcharges and overpayments of insurance payments, mortgage payments, utilities payments, or other similar mass billing and account administration cases.

---

[20]  *Lone Cedar Ranches, Inc. v. Jandebeur*, 523 NW2d 364, 368 (Neb 1994) and other cases set for the elements of an accounting at law.

120.    All records required to determine the amounts wrongfully received by Nelnet are in Nelnet's possession and control. Plaintiffs seek an accounting at law based on the contract of Defendants with DOE and Plaintiffs' promissory notes.

### FIFTH CLAIM
### Violations of The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 ILCS 505/2

121.    Plaintiff Andrew Johansson repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

122.    Andrew Johansson brings this Count on behalf of the Illinois class.

123.    Defendants are "person[s]" within the meaning of 815 ILCS 505/1(c).

124.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of any trade or commerce…whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

125.    In the course of servicing the loans of Johansson and members of the Illinois Class, Defendants commits, or committed, the following unfair and/or deceptive acts or practices in violation of the ICFDBPA:

> a.    Misrepresenting to Johansson that he was not entitled to continue making income-driven payments despite his timely submission of an application to renew his IDR plan;

     b.   Mispresenting to Johansson that he owed monthly payments in the amount dictated by the Standard Repayment Plan when, in fact, such amounts were not owed;

     c.   Misrepresenting to Johansson the correct amount of his principal loan balance after improperly capitalizing the accrued interest on his loans;

     d.   Misrepresenting to Johansson that his loans were subject to a capitalization of interest when his IDR plan was discontinued despite the fact that he timely submitted an application to renew the plan;

     e.   Misrepresenting to Johansson that a hardship forbearance should be applied to his account while Defendants resolved their own processing errors and delays when, in fact, such forbearances are not authorized for that purpose under federal law;

     f.   Unfairly cancelling Johansson's IDR plan despite his timely submission of an application to renew the plan in violation of federal law;

     g.   Unfairly failing to process IDR applications in a reasonably prompt manner as required by federal law.

126.    Defendants knew or should have known that their conduct violated the law.

127.    Defendant's unfair and deceptive practices were material to Johansson and members of the Illinois Class.

128.    Johansson and members of the Illinois Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's deceptive and unfair practices, including, but not limited to, (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same;

(iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same; and (v) adverse credit reporting.

129.    Defendant's violations present a continuing risk of financial harm to Plaintiffs, members of the Classes, and the general public.

130.    Defendant's unlawful acts and practices complained of herein affect the public interest.

131.    Johansson and members of the Illinois Class seek damages under the ICFDBPA for injuries resulting from the direct and natural consequences of Defendants' unlawful conduct.

132.    Johansson and members of the Illinois Class also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the ICFDBPA.

133.    Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## SIXTH CLAIM
### Violations of the Colorado Consumer Protection Act
### (COLO. REV. STAT. § 6-1-105)

134.    Linda Stanley repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

135.    Linda Stanley brings this Count on behalf of the Colorado Class.

136.    Defendants are "persons" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

137.    The Colorado Consumer Protection Act prohibits "deceptive trade practices," which includes the use of "deceptive representations…in connection with goods or services." Colo. Rev. Stat. § 6-1-105(c).

138.    Defendants made the following deceptive representations in connection with their servicing of Stanley's loans in violation of the Colorado Consumer Protection Act:

a.  Misrepresenting to Stanley that she should place her loans into a costly hardship forbearance while her tax returns were being completed when, in fact, she could have certified her income by using a copy of a paystub;

b.  Misrepresenting to Stanley that her loans should be placed in a hardship forbearance while her IDR renewal application was being processed when, pursuant to 34 C.F.R § 685.205(a), such forbearances are only permitted when, "due to poor health or other acceptable reasons, the borrower…is currently unable to make scheduled payments.";

c.  Misrepresenting to Stanley that certain portions of her self-certified income verification letter needed to be written out "by hand" when, in fact, such a requirement has no basis in law;

d.  Misrepresenting to Stanley that her loans were subject to a capitalization of interest when her IDR plan expired despite the fact that Stanley had provided Nelnet with an IDR renewal application prior to the renewal deadline;

e.  Misrepresenting to Stanley that, after the recertification of her IDR plan, she would be required to make monthly payments of approximately $450 despite the fact that her income had not substantially increased since her prior pay period when her payments were less than $100 per month;

30

     f.   Misrepresenting to Stanley that she was not entitled to continue making income-driven payments despite her timely submission of several applications to renew her IDR plan;

     g.   Mispresenting to Stanley that she owed monthly payments in the amount dictated by the Standard Repayment Plan when, in fact, such amounts were not owed;

     h.   Misrepresenting to Stanley the correct amount of her principal loan balance after improperly capitalizing the accrued interest on her loans.

139.    One or more of these material misrepresentations were  made to members of the Colorado Class.

140.    Given the vast number of federal loans serviced by Defendants, these deceptive trade practices significantly impact the public as actual or potential consumers of Nelnet's services.

141.    Linda Stanley and members of the Colorado Class suffered actual damages as a direct and proximate  result of Defendant's deceptive and unfair practices, including, but not limited to, (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; (iii) the loss of the interest subsidy offered by the federal government for those with subsidized loans; (iv) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same; and (v) adverse credit reporting.

142.    Stanley and members of the Colorado Class seek damages under the Colorado Consumer Protection Act for injury resulting from the direct and natural consequences of Defendants' unlawful conduct.

143.    Stanley and members of the Colorado Class also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the Colorado Consumer Protection Act.

144.    Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## ATTACHMENTS

**Attachment A (¶ 69)**: 2009 Nelnet – U.S. Dept of Education  Servicing Contract  .

**Attachment B (¶70):**  Prototype Direct Consolidation Loan Application and Promissory Note / William D. Ford Federal Direct Loan Program (17 pgs)

## REQUESTS FOR RELIEF

Plaintiffs request Orders and Judgment against Defendants and in favor of Plaintiffs:

A.    Certifying this action as a class action for each of the classes identified above pursuant to Fed R. Civ. P. 23, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    Awarding judgment to Plaintiffs and Class Members of each Class for sums determined to be due from Defendants for their wrongful actions.

C.    Awarding taxable costs, compensatory and punitive damages to the extent permitted by law, and pre- and post-judgment interest and reasonable attorneys' fees and expenses to the extent permitted by law.

## **JURY DEMAND; TRIAL LOCATION**

Plaintiffs demand trial by jury.

Plaintiffs designate Lincoln, Nebraska as the place for trial.

By Plaintiffs' Lawyers:

_s/ David A. Domina_   #11043NE
Domina Law Group pc llo
2425 S. 144th St.
Omaha, NE 68144
(402)-493-4100
ddomina@dominalaw.com

_s/ Anthony Fiorentino_
Illinois ARDC Number: 6316521
FIORENTINO LAW OFFICES LTD.
432 N. Clark St, Suite 202
Chicago, Illinois 60654
(312)-853-0050
anthony@fiorentinolaw.com

_s/ Daniel A. Edelman_
Daniel A. Edelman
Cassandra P. Miller
Illinois ARDC #: 00712094
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
20 South Clark Street, Ste 1500
Chicago, Illinois 60603
(312) 739-4200
dedelman@edcombs.com